## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

COURTALERT.COM, INC.,

                Plaintiff,

      v.

AMERICAN LEGALNET, INC.,
EREZ BUSTAN, and ROBERT LOEB,

                Defendants.

No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff, CourtAlert.com, Inc. ("CourtAlert"), brings this action against Defendants, American LegalNet, Inc. ("ALN"), Erez Bustan, and Robert Loeb, and alleges as follows:

## I.   INTRODUCTION

1.      This action arises out of Defendants' concerted, willful, and deliberate scheme to steal CourtAlert's valuable trade secrets, including but not limited to confidential and proprietary information relating to client lists, product offerings, pricing, current status of marketing opportunities, and financial information including sales and revenue data.

2.      For years, Defendant ALN has built a business out of attempting to copy CourtAlert product offerings and aggressively marketing those copycat products. Frustrated by its inability to compete merely through stealing CourtAlert's ideas, ALN eventually turned to more untoward strategies, trying to steal away CourtAlert's employees as well. But even poaching CourtAlert's primary salesperson did little to improve ALN's ability to compete against CourtAlert.

3.      Unable to match the quality of CourtAlert's products or attract away CourtAlert's loyal customer base, ALN undertook to unfairly compete against CourtAlert and to steal

CourtAlert's trade secrets and proprietary information. ALN infiltrated CourtAlert's small team and induced a former CourtAlert employee to violate the confidentiality, non-compete, and non-solicitation terms in his CourtAlert employment agreement. Specifically, ALN recruited CourtAlert's then–head of sales, Defendant Robert Loeb, and directed him to access CourtAlert's confidential and proprietary information, download it, and disclose it to ALN. ALN further induced Loeb to breach the confidentiality and non-solicitation provisions of his CourtAlert employment agreement in an attempt to leverage CourtAlert's confidential pricing information in negotiations with existing and potential CourtAlert clients.

4.      ALN's involvement in Loeb's misconduct was significant and extensive. Indeed, ALN's president evidently helped draft the language of Loeb's resignation letter to CourtAlert and assisted Loeb with his calculation of commissions he claimed CourtAlert owed him.

5.      ALN's ever-intensifying scheme to infiltrate CourtAlert and steal highly sensitive and proprietary information has left CourtAlert with no choice but to seek this Court's intervention to hold ALN accountable for its blatant misconduct, and to put a stop to such misconduct.

## II.   **PARTIES**

6.      Plaintiff, CourtAlert.com, Inc., is a corporation organized under the laws of New York and headquartered in New York.

7.      Defendant American LegalNet, Inc. (ALN) is a corporation organized under the laws of California and headquartered in Encino, California.

8.      Defendant Erez Bustan is the President of ALN and a California resident.

9.      Defendant Robert Loeb is a former CourtAlert employee who now works for ALN as a regional sales manager. He is a New Jersey resident.

III.   **JURISDICTION AND VENUE**

10.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action raises a federal question under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831 *et seq*. This Court has supplemental jurisdiction over CourtAlert's state-law claims pursuant to 28 U.S.C. § 1367.

11.   In addition, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the parties are diverse in citizenship, and the amount in controversy exceeds $75,000.

12.   Venue lies within this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in this District.

13.   The Court has personal jurisdiction over all Defendants. ALN has continuous and systematic business contacts with New York and actively competes with CourtAlert in New York. ALN's Chief Revenue Officer is based in the New York metropolitan area, as is Defendant Loeb acting as ALN's Regional Sales Manager. Loeb was employed in CourtAlert's New York office before ALN poached him; most of the wrongful actions giving rise to the claims in this action were committed in New York.

14.   Venue and jurisdiction are also proper because Loeb agreed to them and waived any challenge as part of his CourtAlert employment agreement:

> Governing Law. All disputes arising from or relating to this Agreement shall be heard exclusively in a court of competent jurisdiction within the State of New York, County of New York, and the parties hereto consent to personal jurisdiction in such courts for such purposes, and further waive all objections on grounds of improper venue or inconvenient forum.

Exhibit A ¶ 12.

3

IV.    **FACTUAL ALLEGATIONS**

A.    **CourtAlert's Business and Confidential Information**

15.    CourtAlert is a family-owned business founded by Izzy Schiller in 1999 and is highly valued by the many clients who use CourtAlert's product offerings and benefit from its client support and customer-oriented business approach.

16.    CourtAlert provides case monitoring, software packages, and other computer services to large law firms and law departments. In addition to various listings and reports, CourtAlert's main product offerings include:

- CourtAlert® Case Management Software
- NY Case Tracking
- Other Courts Case Tracking
- CourtAlert for PACER
- PACER Explorer
- ECF Inform®
- ECF Assurance®
- Realtime Federal Complaints
- Realtime New York Complaints

17.    **Case Monitoring.** CourtAlert has been offering its case monitoring product since 1999. The program reads court databases and dockets and generates emails that it automatically sends to clients with updates for cases that the client elects to "track." New York CourtAlert case monitoring service is the market leader in the case-monitoring industry. CourtAlert's Case Monitoring services are available for many jurisdictions nationwide and for specialized courts such as the Patent Trial and Appeal Board.

18.    **Case Management Software.** In 2005, CourtAlert introduced its Case Management software offering, which is used by large law firms and law departments to record their activities on a case, calculate and report associated events and deadlines, and disseminate these deadlines throughout the organization.

19.     As part of its Case Management product offering, CourtAlert has patented an invention called "reconciliation" (US Patent 8,996,590). The program downloads Electronic Filing notices from various courts, dissects the incoming notice, allows the user to review the information contained therein in an easy-to-digest format, allows the user to add information (including, for example, filing deadlines associated with the notice), and then automatically integrates the resulting information into a case-management system. The program generates and displays a report identifying the docket record and the court-sourced alert to a subscriber or user. The user can then reconcile the court-sourced alert with the docket record. The program automatically downloads and stores attached PDFs for clients to access through their case-management systems.

20.     CourtAlert's competitive advantage depends on confidential information that includes the software design and detail of its functionality, the detailed workflow of CourtAlert's the various services, as well as financial and business plans and strategies, client lists, and economic information.

21.     CourtAlert protects its confidential information by, among other things, restricted access with required username and password as well as other Information Technology routines, including logging and recording all activities and using cameras to monitor all doors through which a third party can access the information. CourtAlert also clearly marks as Confidential all price proposals, statements of work, and other design documents provided to clients.

**B.     ALN's Business Is Built on Copying CourtAlert**

22.     When ALN was established in 1996, it was a legal forms supplier, and it remained in that business for many years. In or about October 2007, ALN decided to enter the docketing-software market and began competing against CourtAlert. Instead of creating a product from scratch, ALN partnered with an OpenText, an enterprise information management company, which provided a base on which ALN could build its product offering. Over the ensuing years,

ALN has introduced new products to its offerings, typically copied or derived from product offerings CourtAlert was already offering its clients.

23.     Since 2009, for example, ALN has offered its "AutoDocket" product, which attempts to copy CourtAlert's reconciliation program in violation of the CourtAlert patent published in 2006 and re-published in November 2008.

24.     In 2011, ALN introduced its "Docket Direct," a product that attempts to replicate CourtAlert's case monitoring service. Like CourtAlert's case monitoring service, Docket Direct emails new updates from the court's database and proposes those deadlines for inclusion in a client's docketing system.

25.     In 2015, ALN announced its ECF Verify, copied from the ECF Assurance® product CourtAlert began offering in 2014. The program compares PACER dockets to ECF emails received by a client.

26.     In June 2019, CourtAlert introduced ECF Inform®, a service that distributes incoming ECF emails to an entire case team. Within weeks, ALN copied the details of CourtAlert's product offering and announced "AutoDocket Pro" that would provide this same function.

27.     The technical details of the foregoing CourtAlert product offerings were highly confidential trade secrets closely guarded by CourtAlert and on which CourtAlert depends for its competitive advantage.

28.     Having built its business largely on the back of CourtAlert's products, ALN decided it wanted more access to CourtAlert's business plans, product offerings, and strategies. The only way to achieve that was to infiltrate CourtAlert's business from the inside, which ALN sought to do by targeting CourtAlert's small team of employees. In February 2019, ALN hired away Sonny

Malhotra, CourtAlert's main salesperson. CourtAlert does not know what information Malhotra provided to ALN.

### C.   Loeb's Employment Agreement

29.     After ALN poached Malhotra, CourtAlert was forced to find a replacement salesperson and ultimately hired Defendant Loeb in July 2019 to serve as CourtAlert's main salesperson. Loeb's title was Account Executive, and he was responsible for promoting all of CourtAlert's services and software and maintaining contact with clients.

30.     CourtAlert and Loeb executed an employment agreement (the "Employment Agreement"), which included clear and critical confidentiality and non-solicitation provisions as set forth below.

> **Confidentiality Agreement.** (a) The Employee understands that during the term of his or her employment, the Employee has been given unpublished and otherwise confidential information ("Confidential Information") both of a technical and non-technical nature, relating to the business of the Company . . . . The Employee agrees to observe all Company policies and procedures concerning such Confidential Information. The Employee further agrees not to disclose or use, either during the Employee's employment or at any time thereafter, any Confidential Information unless authorized to do so by the Company in writing, except that the Employee may disclose and use such information when clearly necessary in the performance of his or her duties for the Company. The Employee's obligations under this Agreement will continue with respect to Confidential Information, whether or not the Employee's employment is terminated, until the Confidential Information becomes generally available from public sources through no fault of the Employee.

> **Non-Solicitation.** (a) During the Employee's employment with the Company and for a period of twenty-four (24) months following the termination thereof, the Employee shall not, directly or indirectly, on his or her own behalf or on behalf of any person, firm or corporation, or in any capacity whatsoever, solicit or accept business from any Customers or prospective Customers of the Company or encourage any Customer or prospective Customer not to do business with the Company. . . .

       (c) For purposes of this Agreement, the term "Customer(s)" shall mean any individual, corporation, partnership, business, municipality, governmental authority or other entity, whether for-profit or not-for-profit public, privately held, or owned by a government that is a business entity or individual with whom the Company has done business or with whom the Employee has actively communicated with during the twelve (12) month period preceding the termination of his or her employment.

A copy of the duly executed Employment Agreement is attached to this complaint as Exhibit A.

### D.    Loeb Resigns and Improperly Accesses CourtAlert's Trade Secrets and Confidential Information for ALN

31.    On May 15, 2020, roughly one year after he began overseeing CourtAlert's sales, Loeb submitted a resignation letter and abruptly quit his position at CourtAlert. The mystery underlying his abrupt resignation did not last long: Loeb immediately was named ALN's regional sales manager for the northeast. Loeb's resignation letter contained an embedded image purporting to represent outstanding commissions that CourtAlert owed him as of the date of his resignation. It also included CourtAlert's revenue from the customers with whom Loeb had interacted and confidential information that Loeb had used to calculate the purported commissions.

32.    When he resigned, Loeb surrendered his CourtAlert-issued laptop. Through forensic analysis of the laptop, CourtAlert learned that ALN's secret plan to use Loeb to gain access to CourtAlert confidential information had been in the works for months. CourtAlert also discovered that immediately before resigning Loeb had accessed and downloaded significant volumes of CourtAlert confidential information and shared it with ALN.

33.    In fact, a recovered file shows that Defendant Erez Bustan, ALN's president, evidently drafted for Loeb the language he came to include in his resignation letter. A May 15 email from Bustan to Loeb included a draft of the letter together with the image depicting the revenue from selected clients and commission calculations.

34.     The May 15 email from Bustan shows that even before Loeb resigned, he was providing—at the very least—CourtAlert's confidential revenue and pricing information to ALN.

35.     Below is a summary timeline of events leading up to Loeb's resignation based on CourtAlert's analysis of the devices Loeb surrendered.

36.     In November 2019, five months after CourtAlert hired him, Loeb began communicating with Joey Perez, a sales manager at ALN. One month later, Loeb sent an email to CourtAlert's COO about renegotiating his compensation. Loeb asked CourtAlert for, among other things, a more than fifty percent increase in his base salary. CourtAlert agreed to extend Loeb's draw on commission for three additional months and re-evaluate his request at the end of that period based on his performance.

37.     In February 2020, Loeb accessed a copy of his Employment Agreement with CourtAlert. The next month, Loeb's calendar indicates he participated in several calls with ALN's President (Defendant Erez Bustan) and Chief Revenue Officer (Anthony Davies).

38.     On April 6, Loeb followed up with ALN and sat with Davies for an in-person interview. Three days later, Loeb participated in a follow-up meeting to review his "Resume and Non-Compete." On April 27, 2020, Davies emailed Loeb an employment application and asked him to complete it for a reference check.

39.     From May 5 to May 14—the days leading up to his resignation—Loeb secretly accessed significant amounts of CourtAlert's confidential information using company devices, evidently to steal from CourtAlert and secretly send to ALN. The stolen information included lists of contacts, clients, and potential clients; confidential financial information on sales and revenues; and internal analyses comparing CourtAlert's products with competing offerings. Loeb accessed and downloaded at least the following documents:

a.  Confidential Salesforce records identifying all New York contacts, clients, and potential clients.[1]

b.  Confidential Salesforce records used to identify Managing Clerk, Docketing Clerk, or Calendar Clerk contacts at existing and potential clients.

c.  Confidential Salesforce records identifying clients, potential clients, and existing revenues for various CourtAlert products, including CourtAlert for PACER and Case Management.

d.  Confidential analysis comparing CourtAlert's Case Management product with ALN offerings and those of another competitor.

e.  Confidential list of potential leads that CourtAlert generated after extracting costly PACER data to identify law firms using a competing service.

f.  Confidential list of recent CourtAlert trial users and an attendance list of the customers and potential customers who attended a March 30 webinar hosted by CourtAlert.

g.  Confidential list of all clients and potential clients that work in law firm library departments—data compiled over decades of working with law firm libraries, the primary target for many CourtAlert services, including among others CourtAlert for PACER, a product targeted to firm library departments and librarians that accounts for a significant percentage of CourtAlert's revenue.

h.  Confidential list of the items currently being monitored for a particular client—important, confidential information that includes not only the cases the firm is currently handling, but also the matters the firm is monitoring as part of its prospective pipeline of cases. These 'watch lists' are maintained by CourtAlert clients in a password-protected web site.

i.  Confidential list of CourtAlert offerings—including highly confidential services or software enhancements that CourtAlert programs and tests with clients. CourtAlert

---

[1] Salesforce is a "customer relationship management" platform that integrates a company's "marketing, sales, commerce, service, and IT teams" and manages a company's "relationships and interactions with customers and potential customers." *What Is Salesforce*, https://www.salesforce.com/products/what-is-salesforce/; *What is CRM?*, https://www.salesforce.com/crm/what-is-crm/. Salesforce is one of the world's leading client-relations management systems, and CourtAlert relies heavily on its functionality. CourtAlert uses Salesforce to track its employees' and representatives' authorized interactions with potential clients. Thus, Loeb's infiltration of Salesforce enabled him not only to access his own past interactions, but also to track the actions of CourtAlert's President, its COO, and any other employees or agents. In addition to logging activities, Salesforce also links to relevant documents, including emails and attachments used or generated during the interaction. If a CourtAlert employee emailed a client, for example, that user typically records not just the fact of the interaction, but also links to copies of the email itself and all email attachments.

designs and tests such products many months before introducing them to market. Loeb was aware of those in-progress offerings and on information and belief disclosed them to ALN.

40.     There was no reason for Loeb to access—much less download—these records in the normal course of his work for CourtAlert. For that reason, Loeb attempted to delete most of these files before he surrendered his laptop. But a forensic expert retained by CourtAlert was ultimately able to recover them as part of its forensic analysis of the device. These documents were confidential and contained some of CourtAlert's core trade secrets, and their disclosure to ALN threatens to significantly harm CourtAlert's business.

41.     After downloading CourtAlert's confidential documents, Loeb abruptly resigned from CourtAlert on May 15, 2020. The resignation email included a demand for commissions on sales. An embedded image of an Excel worksheet depicted a commission schedule that included client names, confidential revenue information, confidential pricing information, and Loeb's expected commissions.

42.     Loeb refused to provide any reason for his resignation or to state whether or where he planned to work next. In emails following his resignation, Loeb asked CourtAlert to reinstate his access to Salesforce under the guise of recalculating his commission. CourtAlert refused.

43.     CourtAlert investigated Loeb's demands for commissions and found them to be exaggerated. Loeb's commissions for new business depended on the type of service sold and the closing of the business. Commissions on growth are calculated based on the amount of growth and the records in Salesforce of his involvement and efforts. During Loeb's time at CourtAlert, Loeb was guaranteed a minimum commission amount, and his final month of employment was the only time he ever earned a commission that exceeded that minimum.

44.     But the commission demand in Loeb's resignation email was based on business from clients that had never closed and fabricated growth amounts that were unsupported by

Salesforce records. CourtAlert ultimately paid Loeb his final commission based on an accurate calculation of what he was owed.

45.     CourtAlert's forensic analysis also revealed a number of items on Loeb's laptop, including a draft of the resignation letter in an email from Defendant Bustan, ALN's President. This proposed resignation letter included CourtAlert's confidential information regarding clients, sales volumes, and revenues. For Bustan to have drafted the letter for Loeb, Loeb would have had to first disclose this revenue and pricing information to Bustan. The day after Bustan sent the email in question, Loeb sent his resignation letter to CourtAlert, containing identical language to the draft language Bustan had proposed to Loeb, with the additional comment that his "keys are on the table next to front door."

46.     On June 9, 2020, CourtAlert's counsel sent a letter to ALN, Bustan, Davies, and Loeb, demanding that Loeb cease and desist from disclosing confidential information to ALN. CourtAlert enclosed a copy of the email from Bustan to Loeb (with the confidential information redacted), as well as a copy of Loeb's employment agreement with CourtAlert. ALN's counsel responded three days later and accused CourtAlert of fabricating the email from Bustan.

**E.     Loeb Solicits CourtAlert Clients**

47.     Defendants wasted little time taking further advantage of the proprietary information they had now obtained from CourtAlert's systems. Throughout the month of June, multiple CourtAlert clients informed CourtAlert that ALN and Loeb had solicited their business.

48.     On June 10, 2020, a contact at Client 1 informed CourtAlert that the client had received an email from Davies announcing that ALN had hired Loeb as a Regional Sales Manager. The client had previously been an ALN E-Docket customer before switching to CourtAlert's Case Management product during the time Loeb was working for CourtAlert. Loeb had met with Client 1 several times during the client's transition to CourtAlert.

49.      In or about June 2020, a contact at Client 2 inadvertently included CourtAlert on his reply to a meeting request from Loeb. Client 2 is a long-time subscriber to CourtAlert's Case Tracking services. During his employment with CourtAlert, Loeb had met with contacts at Client 2 in October 2019 and had assisted with a demonstration of the Case Management System in December 2019.

50.      A contact at Client 3 informed CourtAlert that Loeb had reached out several times in June 2020. Client 3 was a CourtAlert Case Management customer to whom Loeb had successfully sold CourtAlert's Realtime Federal Complaints Business Development service, which produces an email alert for every new federal court filing against a name listed on the watchlist.

51.      In July 2020, CourtAlert learned that Loeb was attempting to sell ALN's E-Docket solution to Potential Client 1, with whom CourtAlert had been negotiating a prospective subscription to CourtAlert's Case Management system during Loeb's tenure. Prior to his resignation, Loeb had built a relationship with Potential Client 1, arranged a CourtAlert product demonstration, and had begun preliminary pricing negotiations in February 2020. Those discussions had temporarily stalled due to the pandemic and did not resume until July. By that point, Loeb was working for ALN, and CourtAlert was ultimately forced to change its proposed deal with the client in order to prevent ALN from taking advantage of Loeb's exploitation of CourtAlert's confidential pricing information with respect to the prospective deal.

52.      On September 18, 2020, the managing attorney of Client 4 informed CourtAlert that it would no longer be moving forward with CourtAlert's Case Management system because the firm had decided to switch to ALN. Prior to his resignation, Loeb had built a relationship with Client 4, including by taking a contact at Client 4 to lunch and by arranging a CourtAlert product demonstration. After his resignation, ALN and Loeb took advantage of these circumstances and

exploited Loeb's knowledge of CourtAlert's confidential pricing information to undermine CourtAlert's negotiations and steal Client 4's business.

## V.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Misappropriation of Trade Secrets Under the Defend Trade Secrets Act**
**18 U.S.C. § 1836, et seq.**
**(Against All Defendants)**

53.   CourtAlert incorporates the allegations above and further alleges as follows:

54.   CourtAlert is the owner of valuable trade secrets related to products and services used in, or intended for use in, interstate or foreign commerce. Such trade secrets include CourtAlert's detail of design and operation of CourtAlert software and services, financial, business, scientific, technical, economic and engineering information, including but not limited to, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs and codes, both tangible and intangible and stored, compiled and memorialized physically, electronically, and graphically.

55.   CourtAlert has taken reasonable measures to keep such information secret.

56.   CourtAlert's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

57.   During the course of his employment at CourtAlert and in order to perform his duties on behalf of CourtAlert, Loeb was granted access to CourtAlert's confidential and proprietary information.

58.   This information is not available to the general public. CourtAlert keeps such information strictly confidential in order to maintain an advantage in its highly competitive business.

59.     Defendants disclosed or used CourtAlert's trade secrets without CourtAlert's express or implied consent. Defendants used improper means to acquire knowledge of the trade secrets when ALN induced Loeb to access and download client lists, sales revenue, commissions, and pricing.

60.     Defendants knew or had reason to know at the time of disclosure or use that their knowledge of the trade secrets was derived from or through CourtAlert and that Defendants used improper means to acquire the trade secrets. Defendants acquired the trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets. Defendants owed a duty to CourtAlert to maintain the secrecy of its trade secrets or limit use thereof.

61.     Defendants' improper means in disclosing CourtAlert's trade secrets include when Loeb shared information about calculating his commissions, client lists, and pricing.

62.     Defendants, with intent to convert trade secrets that are related to a product or service used or intended for use in interstate or foreign commerce to the economic benefit of CourtAlert, and intended or knowing that the offense will injure CourtAlert, knowingly did the following:

   a. stole such information, or removed or concealed it without authorization, or obtained it by fraud, artifice, or deception;

   b. copied, duplicated, sketched, photographed, downloaded, uploaded, altered, destroyed, photocopied, replicated, transmitted, delivered, sent, mailed, communicated, or conveyed such information without authorization;

   c. received or possessed such information, knowing the same to have been stolen or appropriated, or obtained or converted such information without authorization;

   d. attempted to commit any offense described in paragraphs (a) through (c); or

   e. conspired with one or more other persons to commit any offense described in paragraphs (a) through (c), and one or more of such persons performed an act to effect the object of the conspiracy.

63.     Defendants continue to misappropriate CourtAlert's proprietary information by soliciting clients or potential clients and leveraging CourtAlert's confidential pricing and revenue information against it. As a result of such misappropriation, CourtAlert has suffered damages in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**Unfair Competition and Misappropriation Under New York Law**
**(Against All Defendants)**

64.     CourtAlert incorporates the allegations above and further alleges as follows:

65.     CourtAlert is the owner of valuable trade secrets related to products and services used in, or intended for use in, interstate or foreign commerce. Such trade secrets include CourtAlert software and service design and details, financial, business, scientific, technical, economic and engineering information, including but not limited to compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs and codes, both tangible and intangible and stored, compiled and memorialized physically, electronically and graphically.

66.     CourtAlert has taken reasonable measures to keep such information secret.

67.     CourtAlert's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. CourtAlert derives an economic advantage of its competitors from its trade secrets.

68.     During the course of his employment at CourtAlert and in order to perform his duties on behalf of CourtAlert, Loeb was granted access to CourtAlert's confidential and proprietary information.

69.     Defendants disclosed or used CourtAlert's trade secrets without CourtAlert's express or implied consent. Defendants used improper means to acquire knowledge of the trade secrets when ALN induced Loeb to access and download client lists, commissions, and pricing.

70.     Defendants knew or had reason to know at the time of disclosure or use that their knowledge of the trade secrets was derived from or through CourtAlert and that Defendants used improper means to acquire the trade secrets. Defendants acquired the trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets. Defendants owed a duty to CourtAlert to maintain the secrecy of its trade secrets or limit use thereof.

71.     Defendants' improper means in disclosing CourtAlert's trade secrets include when Loeb shared information about calculating his commissions, client lists, and pricing.

72.     Defendants, with intent to convert trade secrets that are related to a product or service used or intended for use in commerce to the economic benefit of CourtAlert, and intended or knowing that the offense will injure CourtAlert, knowingly did the following:

   a.  stole such information, or removed or concealed it without authorization, or obtained it by fraud, artifice, or deception;

   b.  copied, duplicated, sketched, photographed, downloaded, uploaded, altered, destroyed, photocopied, replicated, transmitted, delivered, sent, mailed, communicated, or conveyed such information without authorization;

   c.  received or possessed such information, knowing the same to have been stolen or appropriated, or obtained or converted such information without authorization;

   d.  attempted to commit any offense described in paragraphs (a) through (c); or

   e.  conspired with one or more other persons to commit any offense described in paragraphs (a) through (c), and one or more of such persons performed an act to effect the object of the conspiracy.

73.     Defendants continue to misappropriate CourtAlert's proprietary information through his employment with ALN. As a result of such misappropriation, CourtAlert has suffered damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**Breach of Contract**
**(Against Defendant Loeb)**

74.     CourtAlert incorporates the allegations above and further alleges as follows:

75.     The Employment Agreement between CourtAlert and Loeb is a valid, enforceable written contract, with definite and certain terms. *See* Exhibit A.

76.     The Employment Agreement required Loeb to hold confidential all "unpublished and otherwise confidential information both of a technical and non-technical nature, relating to the business of the Company" that was disclosed to him in the course of his employment. Ex. A ¶ 3. Loeb agreed "not to disclose or use, either during the Employee's employment or at any time thereafter, any Confidential Information unless authorized to do so by the Company in writing" or "until the Confidential Information becomes generally available from public sources through no fault of the Employee." *Id.* Loeb also agreed that if his employment was terminated for any reason, he would "not keep any such documents, materials or information in his or her possession, recreate them or deliver them to anyone else." *Id.*

77.     As stated above, Loeb breached the Employment Agreement by, among other things, misappropriating CourtAlert's confidential information and trade secrets and disclosing them to ALN and its executives.

78.     The Employment Agreement also included a non-solicitation provision. Loeb agreed to not "directly or indirectly, on his or her own behalf or on behalf of any person, firm or corporation, or in any capacity whatsoever, solicit or accept business from any [CourtAlert] Customers or prospective Customers of the Company or encourage any Customer or prospective

Customer not to do business with the Company" for the 24-month period following termination of his employment.

79.     As detailed above, Loeb breached the Employment Agreement by, among other things, soliciting CourtAlert's customers on behalf of ALN.

80.     As a result of Loeb's violations of the Employment Agreement, CourtAlert has suffered damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**Tortious Interference With Contract**
**(Against Defendants ALN and Bustan)**

81.     CourtAlert incorporates the allegations above and further alleges as follows:

82.     The Employment Agreement is a valid, enforceable written contract between CourtAlert and Loeb.

83.     As discussed above, CourtAlert and Loeb entered into an Employment Agreement containing confidentiality restrictions prohibiting the disclosure of CourtAlert's confidential information and Trade Secrets, as well as non-solicitation restrictions.

84.     CourtAlert satisfied all of its obligations pursuant to the Employment Agreement.

85.     Defendants ALN and Bustan were at all times aware of the Employment Agreement. In willful and malicious disregard of the Employment Agreement, and with the intention to cause its breach, these defendants intentionally and tortiously interfered with the contract by inducing Loeb to disclose and use CourtAlert's confidential information and trade secrets, and to solicit CourtAlert's customers.

86.     Defendants' actions in inducing these breaches of contract were and are intentional, illegal, and without justification, and have been taken for the specific purpose of inducing Loeb to breach his agreement with CourtAlert.

87.     As a direct and proximate cause of these defendants' tortious interference with the Employment Agreement, CourtAlert has suffered and will continue to suffer damages, in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (Against Loeb)

88.     CourtAlert incorporates the allegations above and further alleges as follows:

89.     As an employee of CourtAlert, Loeb owed CourtAlert his undivided loyalty and was obligated to act with the utmost good faith, and in the best interests of CourtAlert.

90.     CourtAlert was entitled to place its trust and confidence in Loeb and to expect Loeb to act with the utmost good faith toward CourtAlert in carrying out CourtAlert's business.

91.     CourtAlert relied on Loeb's loyalty and integrity and his faithful performance of his duties and responsibilities.

92.     Loeb took advantage of CourtAlert's faith in him by not performing his duties to CourtAlert, by acting in conflict of interest, by engaging in business for his own account and for CourtAlert's competitor ALN, and in competition with CourtAlert, and by deceiving CourtAlert and concealing his improper conduct.

93.     Loeb knowingly and willfully breached his duty of loyalty to CourtAlert by scheming to deceive and defraud CourtAlert, misappropriating and unlawfully taking CourtAlert's confidential and trade secret information, attempting to divert customers to ALN, soliciting CourtAlert's customers on his own behalf and on behalf of ALN, while employed by CourtAlert, and diverting and misappropriating CourtAlert's trade secrets, confidential and proprietary business information, proprietary methodologies, and customers.

94.     As a direct and proximate cause of Loeb's breach of fiduciary duty, CourtAlert has suffered and will continue to suffer damages, in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
**Unfair Competition**
**(Against ALN)**

95.     CourtAlert incorporates the allegations above and further alleges as follows:

96.     CourtAlert devoted substantial amounts of time, effort, money, talent, and creativity to the development of its trade secrets. CourtAlert has taken reasonable steps to maintain the secrecy of its trade secrets, including by requiring any party granted access to them to sign confidentiality or nondisclosure agreements. These confidential and proprietary trade secrets, which belong exclusively to CourtAlert, are of substantial economic value and have conferred a competitive advantage on CourtAlert.

97.     CourtAlert likewise utilizes non-competition and non-solicitation agreements with its employees and former employees to protect its investment of time, energy, and resources into its employees.

98.     ALN induced CourtAlert employees and former employees to disclose CourtAlert's Trade Secrets and other confidential and proprietary information to ALN, in violation of the employees' contractual and fiduciary obligations to CourtAlert.

99.     ALN also misappropriated CourtAlert's property—trade secrets and other confidential and proprietary information—to which enable ALN to compete with CourtAlert, which ALN otherwise would have been unable to do.

### SEVENTH CAUSE OF ACTION
**Unjust Enrichment**
**(Against ALN)**

100.    CourtAlert incorporates the allegations above and further alleges as follows:

101.    ALN has been enriched and has benefitted from its use of CourtAlert's trade secrets by, for example, accelerating development of its own competing product and gaining an unfair commercial advantage over CourtAlert.

102.    ALN has been enriched at CourtAlert's expense, as CourtAlert has devoted substantial amounts of time, effort, money, talent, and creativity to the development of its property, including its confidential information and trade secrets.

103.    ALN knew that targeting CourtAlert's employees and former employees and inducing them to disclose CourtAlert's trade secrets and other confidential information would harm CourtAlert.

104.    Equity requires restitution for ALN's inequitable misconduct, including its intentional and knowing misappropriation of CourtAlert's property and confidential information, including CourtAlert's trade secrets, for the purpose of exploiting and utilizing the Trade Secrets for ALN's own financial benefit.

## VI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

i.    A judgment that Defendants misappropriated CourtAlert's trade secrets as alleged herein.

ii.    An injunction barring ALN and its agents, servants, employees, attorneys, successors, and assigns, as well as all persons, firms, and corporations acting in concert with it, from:

1.    inducing any current or former employees of CourtAlert to disclose any of CourtAlert's Trade Secrets;

2.    making any use whatsoever of CourtAlert's Trade Secrets; or

3.    interfering with the Confidentiality and Non-Compete Agreements between CourtAlert and any of CourtAlert's current or former employees.

iii.  Compensatory Damages;

iv.  Punitive Damages;

v.  Expenses, costs, and attorneys' fees.

### JURY TRIAL DEMAND

Plaintiff demands a trial by jury for all claims.

Dated: September 18, 2020
New York, New York

<div style="margin-left:40%">

*/s/ Jason Cyrulnik*
Jason Cyrulnik
Paul Fattaruso
Joseph Delich
**ROCHE CYRULNIK FREEDMAN LLP**
99 Park Street, Suite 1910
New York, New York 10016
*Attorneys for Plaintiff*

</div>