

**Lori Barnea**
T 646.883.1319
lori@herzberglawgroup.com

June 9, 2020


VIA ELECTRONIC MAIL

Mr. Erez Bustan
President
American LegalNet
16501 Ventura Blvd
Encino, CA 91436
erez@alncorp.com

Mr. Joseph Scott
Vice President
American LegalNet
16501 Ventura Blvd
Encino, CA 91436
jscott@alncorp.com

Mr. Anthony Davies
Chief Revenue Officer
American LegalNet
16501 Ventura Blvd
Encino, CA 91436
adavies@alncorp.com

Mr. Robert Loeb
1000 West Street, Apt 2A
Union City, NJ 07087
robloeb@yahoo.com

Re:    CourtAlert.com, Inc.

Dear Mr. Bustan, Mr. Scott, Mr. Davies and Mr. Loeb:

This firm represents CourtAlert.com, Inc. ("CourtAlert" or the "Company"), Mr. Loeb's former employer. We wish to inform you of Mr. Loeb's obligations to CourtAlert pursuant to the terms of the Confidentiality and Non-Solicitation Agreement contained in the Employment Agreement ("Agreement") that Mr. Loeb entered into with CourtAlert on July 15, 2019, a copy of which is attached hereto as Exhibit A. We believe that Mr. Loeb has disclosed Company confidential information to American LegalNet and American



LegalNet may be aiding and abetting Mr. Loeb and tortiously interfering with his contractual obligations to CourtAlert.

Pursuant to the Agreement, Mr. Loeb is obligated to keep in the strictest confidence all confidential information, including but not limited to software and services design details, cost information, customer lists and contact information, trade secrets and intellectual property of the Company ("Confidential Information").

CourtAlert has reason to believe that Mr. Loeb may have breached his confidentiality obligations by disclosing to American LegalNet sensitive client account and compensation information prior to his departure from the Company. Our belief arises from his resignation email, which seems to have been drafted or approved by Mr. Bustan as revealed by the signature block at the end of Mr. Loeb's resignation email that Mr. Loeb saved to his CourtAlert issued laptop, a copy of which is attached hereto as <u>Exhibit B</u>.

Further, pursuant to paragraph 5(a) of the Agreement, for a period of twenty-four (24) months following the cessation of his employment with CourtAlert, Mr. Loeb may not directly or indirectly solicit customers, former customers, prospective customers or employees of the Company. Should Mr. Loeb solicit any of the clients listed in the resignation email or any other clients of CourtAlert, and the Company determines that American LegalNet has aided and abetted Mr. Loeb in this breach of his obligations, CourtAlert reserves its right to pursue all legal remedies available, to the full extent of the law.

Mr. Loeb must immediately comply with his continuing obligations to the Company and cease all activities in violation of his Agreement. To the extent that Mr. Loeb retained Confidential information, or to the extent that American LegalNet has possession of any such information, we ask that Mr. Loeb and American LegalNet immediately return all such Confidential Information including originals and copies of documents, property or other information and certify in writing that the neither has retained any CourtAlert Confidential Information.

Finally, we caution you that you are obligated to preserve all email, voicemail, smartphones or other PDA transmissions, telephone logs and digital or paper copies of documents relating to the relationship between yourself and CourtAlert customers and confidential information. Any digital information should be preserved in its native form with all related metadata.



      Nothing in this letter shall be construed as a waiver of any right or remedy available to the Company.

Very truly yours,

Lori Barnea

cc: Mr. Yaniv Schiller, Chief Operations Officer, CourtAlert.com
    Mr. Izzy Schiller, President, CourtAlert.com

Employment Agreement


This Confidentiality and Non-Solicitation Agreement ("Agreement") is executed this __15__ day of July, 2019, by and between CourtAlert.com, Inc., its parents, subsidiaries, divisions and affiliates (the "Company") and Rob Loeb (the "Employee").

1.      Duties. Account Representative for all CourtAlert services and software in New York and elsewhere. CourtAlert may hire additional Account Representative and will then assign territories or sectors. Duties include phone calls and emails, in-person meetings, presentations, nationwide trade show participation etc.

2.      Start Date, Compensation, Benefits

(a)      Your start date will be around July 15, 2019.

(b)      CourtAlert shall pay you an annual base salary of $70,000.00 less payroll deductions and all required withholdings. You will be paid semi-monthly on the Company's regular payroll dates.

(c)      You will be paid a non-recoverable draw on commissions in the total amount of $20,000, less payroll deductions and all required withholdings in the first six (6) month from the date of your employment. You will be eligible for monthly commissions based on your attainment of new business under the terms and conditions of the commission plan. Earned commissions will be paid quarterly.

(d)      Commissions of any new business you obtain, from qualified existing and new clients, in the assigned territory, as following:

(i) 10% of CourtAlert watch services, including state case monitoring, CourtAlert for PACER, ECF Inform, ECF Assurance and Realtime Federal Complaints for the first year the service is used.

(ii) 20% of new Case Management license fee clients up to $12,500 per each new client. Professional Services, Maintenance and rules monthly fees are not subject to commission

(iii) Commissions of future services – to be determined

Commissions will be calculated at the end of each three-month period and paid within the first two weeks of the following month. Should the employment be terminated by either the Employee or CourtAlert, for whatever reason, no further commissions are due, including any in-process discussions and transactions not signed. Qualified clients: for a client to be commissionable it must be a new business clearly obtained by you and is a result of your sales effort as documented in the Salesforce system. Customers that approach CourtAlert on their volition are not commissionable. We maintain the right to determine which account was obtained as a result of your effort and is commissionable but such decision will be reasonable. Example:

1

You successfully market CourtAlert for PACER, a service that alerts clients with new and changed PACER docket entries on a monitored case, to a new or an existing client. The client put 100 District Court cases on a daily want, the revenue is about $3,675 per month and your commission on this transaction will be $367.50 per month, for the 12 month of the first year, total $4,410. No further commission are due from this client after the first year.

When the income to you from commissions plus salary becomes more than $11,666.67 per month ($140,000 per year), we will start reducing the salary portion by 20%. Further reduction may occur on further large commission growth.

(e)     CourtAlert offers a range of Healthcare options and will reimburse healthcare cost up to $350 monthly. CourtAlert will deduct all relevant taxes as required by law. Please note that this offer of employment is contingent on your ability to demonstrate authorization to be employed lawfully in the United States at the time of hire and will be limited by whatever constraints or other limitations are placed on that work authorization by law. This offer of employment (as well as continued employment) is subject to final reference checking and satisfactory completion of CourtAlert's pre-employment screening process.

(f)     Employee shall be entitled to ten (10) paid vacation and sick days, in accordance with the vacation policy. In addition, Employee shall be entitled to paid holidays, in accordance with the policy.

Bonus Eligibility. Discretionary Bonus. At the end of each calendar year, CourtAlert shall determine, in its sole discretion, your eligibility for a discretionary bonus based upon your performance and the performance of CourtAlert.

3.     Confidentiality Agreement. (a) The Employee understands that during the term of his or her employment, the Employee has been given unpublished and otherwise confidential information ("Confidential Information") both of a technical and non-technical nature, relating to the business of the Company and any of its parents, subsidiaries, divisions or affiliates, its actual or anticipated business, research, its technology or the implementation or exploitation thereof, including without limitation information the Employee and others have collected, obtained or created, information pertaining to or obtained from clients, customers, accounts, vendors, prices, costs, materials, processes, codes, material results, technology, development, ideas, plans, software codes and designs, algorithms, inventions, patent applications, notebooks, formulas, engineering designs, hardware configuration information, licenses, marketing plans and trade secrets including information disclosed to the Company by others under agreements to hold such information confidential. The Employee agrees to observe all Company policies and procedures concerning such Confidential Information. The Employee further agrees not to disclose or use, either during the Employee's employment or at any time thereafter, any Confidential Information unless authorized to do so by the Company in writing, except that the Employee may disclose and use such information when clearly necessary in the performance of his or her duties for the Company. The Employee's obligations under this Agreement will continue with respect to Confidential Information, whether or not the Employee's employment is terminated, until the Confidential Information becomes generally available from public sources through no fault of the Employee. Notwithstanding the foregoing, however, the Employee may disclose Confidential Information as may be required by a subpoena or other governmental order,

2

provided that the Employee first notifies the Company of such subpoena, order or other requirement and allows the Company the opportunity to obtain a protective order or other appropriate remedy.

(b)     During the Employee's employment upon the request of the Company or upon the termination of the Employee's employment for any reason, the Employee will promptly deliver to the Company all documents, records, files, notebooks, manuals, letters, notes, reports, customer and supplier lists, cost and profit data, e-mail and any other material of the Company, including all materials pertaining to Confidential Information, developed by the Employee or others, and all copies of such materials, whether of a technical, business or fiscal nature, whether on the hard drive of a laptop or desktop computer, in hard copy, disk or any other format, which are in the Employee's possession, custody or control. If the Employee personally owns the laptop or desktop computer on which the Confidential Information is stored, the company will erase the Confidential Information and will return the equipment to the Employee. The Employee agrees to cooperate and assist in such effort. The Employee further agrees that (s)he will not keep any such documents, materials or information in his or her possession, recreate them or deliver them to anyone else. The Employee further agrees that all Company owned property, whether situated on the premises or outside of its premises, including smartphones, PDA's, thumb drives, laptop computers, printers, disks and other storage media, filing cabinets or other work areas and including any email transmitted from any Company or other system relating to the Company is subject to inspection by Company personnel at any time with or without notice.

4.    Work for Hire, Assignment of Intellectual Property.

(a)     Employee agrees that all materials created by Employee under this Agreement, including but not limited to programming design, specifications and code, drawings, ideas, inventions, discoveries, improvements, plans, models, sketches, and all results and proceeds created, conceived, or made by Employee alone or with others at any time during his or her employment, and all of my work product in connection therewith, whether patentable or not, (collectively, "Materials"), shall be deemed to be "work[s] made for hire" as defined in the United States Copyright Act. The Company shall own the Materials, including the work, and all proprietary and intellectual property rights therein and thereto, including but not limited to, all copyrights and trademarks, and all of the results and proceeds of Employee's employment hereunder throughout the universe in perpetuity, free of any and all claims by Employee or any person, corporation or other entity performing services for or deriving any rights from Employee. Employee hereby waives all moral rights in and to the Materials. Employee shall promptly disclose to Company any and all Materials. Additionally, or alternatively, as the case may be and notwithstanding any other provision in this Agreement, Employee hereby agrees to assign and assigns to the Company all rights, including but not limited to, all copyrights, patents, and other proprietary and intellectual property rights, as well as all moral rights that Employee has or may acquire in and/or to the Materials, or any of them, and agrees to execute and deliver to Company any and all applications, assignments and other instruments relating thereto which the Company deems necessary or desirable in its discretion. These obligations shall continue beyond the termination of Employee's employment with respect to Materials and derivatives of such Materials conceived or made during Employee's employment with the Company. Employee understands that the obligation to assign Materials to the Company shall not apply to any

3

materials developed entirely on Employee's own time without using any of the Company's equipment, supplies, facilities, and/or Confidential Information unless such Materials (i) relate in any way to the business or to the current or anticipated research or development of the Company; or (ii) results in any way from the work Employee provided to the Company.

(b)     In any jurisdiction in which moral rights cannot be assigned, Employee hereby waives any such moral rights and any similar or analogous rights under the applicable laws of any country of the world that Employee may have in connection with the Materials for all uses of the Materials, and to the extent such waiver is unenforceable, hereby covenants and agrees not to bring any claim, suit or other legal proceeding against the Company claiming that Employee's moral rights have been violated.

(c)     Employee agrees to cooperate fully with the Company, both during and after Employee's employment with the Company, with respect to the procurement, maintenance and enforcement of copyrights, patents, trademarks, trade secrets and/or other intellectual property or proprietary rights (both in the United States and foreign countries) relating to such Materials. Employee shall execute and deliver to Company all papers, including, without limitation, copyright applications, patent applications, declarations, oaths, formal assignments, assignments of priority rights and powers of attorney, which the Company may deem necessary or desirable in order to protect its rights and interests in any Materials. Employee further agrees that if the Company is unable, after reasonable effort, to secure Employee's signature on or delivery to Company of any such papers, any officer of the Company shall be entitled to execute such papers as Employee's agent and attorney-in-fact and Employee hereby irrevocably designates and appoints each officer of the Company as Employee's agent and attorney-in-fact to execute any such papers on Employee's behalf and to take any and all actions as the Company may deem necessary or desirable in order to protect its rights and interests in any Materials, under the conditions described in this paragraph.

5.     Non-Solicitation. (a) During the Employee's employment with the Company and for a period of twenty-four (24) months following the termination thereof, the Employee shall not, directly or indirectly, on his or her own behalf or on behalf of any person, firm or corporation, or in any capacity whatsoever, solicit or accept business from any Customers or prospective Customers of the Company or encourage any Customer or prospective Customer not to do business with the Company.

(b)     The Employee further agrees, for a period of twenty-four (24) months after termination of his or her employment with the Company, that (s)he will not directly or indirectly hire, solicit or attempt to hire or solicit any employee of, or consultant to the Company, which employee or consultant had been rendering services to the Company at anytime within the twelve (12) month period immediately preceding the termination of employment.

(c)     For purposes of this Agreement, the term "Customer(s)" shall mean any individual, corporation, partnership, business, municipality, governmental authority or other entity, whether for-profit or not-for-profit public, privately held, or owned by a government that is a business entity or individual with whom the Company has done business or with whom the Employee has actively communicated with during the twelve (12) month period preceding the termination of his or her employment.

4

(d)      The Employee agrees that in the event a court determines the length of time or activities prohibited under this Agreement are too restrictive to be enforceable, the court may reduce the scope of the restriction to the extent necessary to make the restriction enforceable.

6.      Non-Disparagement.   During the term of Employee's employment with the Company, and thereafter without limitation of time, Employee agrees not to make any written or oral statements to any person or entity that impugns, disparages or defames the products, services, character, ethics or integrity of the Company, its officers, directors, shareholders or owners.  This Section does not in any way restrict or impede the Employee from exercising his or her rights under Section 7 of the National Labor Relations Act, including the right to engage in protected concerted activities.

7.      Background Check. This offer is contingent upon a successful employment verification of criminal, education, and employment background. This offer can be rescinded based upon data received in the verification.

8.      Business Ethics. The policy of CourtAlert is to conduct business in accordance with the highest ethical standards and to comply with all laws and regulations applicable to its business. All CourtAlert Employees are expected to conduct their personal and business dealings in accordance with the letter, spirit and intent of this Code and all relevant laws and to refrain from any form of illegal, dishonest or unethical conduct. All CourtAlert Employees assume a duty to the Company, its customers and shareholders to act, in all matters, in a manner that will merit the continued trust and confidence of the public. The honesty and integrity of the CourtAlert business conduct must not be compromised. Any activity which might reflect unfavorably upon the Company's or the individual's integrity is to be carefully avoided.

Employee shall not offer or give or agree to give to any person potentially or actually conducting business with CourtAlert any gift or consideration of any kind as an inducement or reward for doing or forbearing to do or for having done or forborne to do any act in relation to CourtAlert business.

9.      Employment At-Will.  Employee understands that (s)he remains an employee-at-will and that this Agreement does not constitute a contract of employment and does not imply that his or her employment will continue for any period of time. You may terminate your employment at any time on 21 days' written notice; provided that CourtAlert may waive the 21-day written notice period in its sole discretion. If CourtAlert does not elect to waive the 21-day written notice period, then CourtAlert shall pay you your base salary during the 21-day period.

10.      Injunctive Relief.  Without limiting the remedies available to the Company, the Employee acknowledges that a breach of any of the covenants contained in this Agreement may result in material irreparable injury to the Company for which there is no adequate remedy at law, that it will not be possible to measure damages for such injuries precisely and that, in the event of such a breach or threat thereof, the Company shall be entitled to obtain a temporary restraining order and/or a preliminary injunction restraining the Employee from engaging in activities prohibited by this Agreement or such other relief as may be required to specifically enforce any of the covenants of this Agreement.

11.  Severability.  If any provision of this Agreement is declared void or unenforceable by a court of competent jurisdiction, all other provisions shall nonetheless remain in full force and effect.

12.  Governing Law.  This Agreement shall be governed by and interpreted exclusively in accordance with the laws of New York State, without regard to conflict of laws provisions thereof to the extent that the general application of the laws of another jurisdiction would be required thereby. All disputes arising from or relating to this Agreement shall be heard exclusively in a court of competent jurisdiction within the State of New York, County of New York and the parties hereto consent to personal jurisdiction in such courts for such purposes, and further waive all objections on grounds of improper venue or inconvenient forum.

13.  Waiver.  The waiver by either party of a breach of any provision of this Agreement shall not constitute or be construed as a waiver of any subsequent breach. The failure of a party to insist upon strict adherence to any provision of this Agreement on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that provision or any other provision of this Agreement.

14.  Assignment.  This Agreement is a personal contract and Employee may not sell, transfer, assign, pledge or hypothecate his or her rights, interests and obligations hereunder. Except as otherwise herein expressly provided, this Agreement shall be binding upon and shall inure to the benefit of Employee and his or her personal representatives and shall inure to the benefit of and be binding upon the Company and its successors and assigns, including without limitation, any corporation or other entity into which the Company is merged or which acquires all or substantially all of the assets of the Company.

15.  Entire Agreement.  This Agreement embodies all of the representations, warranties, and agreements between the parties relating to the Employee's employment. No other representations, warranties, covenants, understandings, or agreements exist between the parties.  This Agreement shall supersede all agreements, written or oral, relating to the Employee's employment. This Agreement may not be amended, modified or terminated except by a writing signed by the parties.

[*Signature page follows*]

6



IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered on the date below.

_____          7-9-19
**Rob Loeb**                                           **Date**

**COURTALERT**

By: _____          7/15/2019
      **Yaniv Schiller**                    **Date**
      **Chief Operating Officer**

7

Dear Yaniv.

I hereby tender my resignation from my employment with Court Alert.   My intention is to end my employment effective May 15, 2020 but I am willing to serve the standard notice period which can be waived at a Court Alert discretion as mentioned paragraph 9 of my employment agreement. During that period, CourtAlert will continue to pay me my salary and any commissions earned.
Please note that I went to the office this morning and drop off the company equipment and materials issued to me.
I sincerely appreciate the opportunity that you have given me and wish you the best of luck.

In addition to my regular pay, unused earned vacation, and any unpaid expense reimbursements, I am also owed the commissions on the following accounts:

REDACTED

Thank you.
Rob Loeb

**Erez Bustan  | President and CEO | American LegalNet, Inc. |** Office: 818-817-9225 ext 210| Fax: 818-817-9238
**American LegalNet, Inc.** | (818) 817-9225 ext.1039 | ALNCorp.com



 Please consider the environment before printing this e-mail.

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, forwarding, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by e-mail or telephone, and delete the original message immediately. For more information, please visit ALNCorp.com.  Thank you.

Employment Agreement


This Confidentiality and Non-Solicitation Agreement ("Agreement") is executed this __15__ day of July, 2019, by and between CourtAlert.com, Inc., its parents, subsidiaries, divisions and affiliates (the "Company") and Rob Loeb (the "Employee").

1.     Duties. Account Representative for all CourtAlert services and software in New York and elsewhere. CourtAlert may hire additional Account Representative and will then assign territories or sectors. Duties include phone calls and emails, in-person meetings, presentations, nationwide trade show participation etc.

2.     Start Date, Compensation, Benefits

(a)     Your start date will be around July 15, 2019.

(b)     CourtAlert shall pay you an annual base salary of $70,000.00 less payroll deductions and all required withholdings. You will be paid semi-monthly on the Company's regular payroll dates.

(c)     You will be paid a non-recoverable draw on commissions in the total amount of $20,000, less payroll deductions and all required withholdings in the first six (6) month from the date of your employment. You will be eligible for monthly commissions based on your attainment of new business under the terms and conditions of the commission plan. Earned commissions will be paid quarterly.

(d)     Commissions of any new business you obtain, from qualified existing and new clients, in the assigned territory, as following:

(i) 10% of CourtAlert watch services, including state case monitoring, CourtAlert for PACER, ECF Inform, ECF Assurance and Realtime Federal Complaints for the first year the service is used.

(ii) 20% of new Case Management license fee clients up to $12,500 per each new client. Professional Services, Maintenance and rules monthly fees are not subject to commission

(iii) Commissions of future services – to be determined

Commissions will be calculated at the end of each three-month period and paid within the first two weeks of the following month. Should the employment be terminated by either the Employee or CourtAlert, for whatever reason, no further commissions are due, including any in-process discussions and transactions not signed. Qualified clients: for a client to be commissionable it must be a new business clearly obtained by you and is a result of your sales effort as documented in the Salesforce system. Customers that approach CourtAlert on their volition are not commissionable. We maintain the right to determine which account was obtained as a result of your effort and is commissionable but such decision will be reasonable. Example:

You successfully market CourtAlert for PACER, a service that alerts clients with new and changed PACER docket entries on a monitored case, to a new or an existing client. The client put 100 District Court cases on a daily want, the revenue is about $3,675 per month and your commission on this transaction will be $367.50 per month, for the 12 month of the first year, total $4,410. No further commission are due from this client after the first year.

When the income to you from commissions plus salary becomes more than $11,666.67 per month ($140,000 per year), we will start reducing the salary portion by 20%. Further reduction may occur on further large commission growth.

(e)     CourtAlert offers a range of Healthcare options and will reimburse healthcare cost up to $350 monthly. CourtAlert will deduct all relevant taxes as required by law. Please note that this offer of employment is contingent on your ability to demonstrate authorization to be employed lawfully in the United States at the time of hire and will be limited by whatever constraints or other limitations are placed on that work authorization by law. This offer of employment (as well as continued employment) is subject to final reference checking and satisfactory completion of CourtAlert's pre-employment screening process.

(f)     Employee shall be entitled to ten (10) paid vacation and sick days, in accordance with the vacation policy. In addition, Employee shall be entitled to paid holidays, in accordance with the policy.

Bonus Eligibility. Discretionary Bonus. At the end of each calendar year, CourtAlert shall determine, in its sole discretion, your eligibility for a discretionary bonus based upon your performance and the performance of CourtAlert.

3.     Confidentiality Agreement. (a) The Employee understands that during the term of his or her employment, the Employee has been given unpublished and otherwise confidential information ("Confidential Information") both of a technical and non-technical nature, relating to the business of the Company and any of its parents, subsidiaries, divisions or affiliates, its actual or anticipated business, research, its technology or the implementation or exploitation thereof, including without limitation information the Employee and others have collected, obtained or created, information pertaining to or obtained from clients, customers, accounts, vendors, prices, costs, materials, processes, codes, material results, technology, development, ideas, plans, software codes and designs, algorithms, inventions, patent applications, notebooks, formulas, engineering designs, hardware configuration information, licenses, marketing plans and trade secrets including information disclosed to the Company by others under agreements to hold such information confidential. The Employee agrees to observe all Company policies and procedures concerning such Confidential Information. The Employee further agrees not to disclose or use, either during the Employee's employment or at any time thereafter, any Confidential Information unless authorized to do so by the Company in writing, except that the Employee may disclose and use such information when clearly necessary in the performance of his or her duties for the Company. The Employee's obligations under this Agreement will continue with respect to Confidential Information, whether or not the Employee's employment is terminated, until the Confidential Information becomes generally available from public sources through no fault of the Employee. Notwithstanding the foregoing, however, the Employee may disclose Confidential Information as may be required by a subpoena or other governmental order,

2

provided that the Employee first notifies the Company of such subpoena, order or other requirement and allows the Company the opportunity to obtain a protective order or other appropriate remedy.

        (b)    During the Employee's employment upon the request of the Company or upon the termination of the Employee's employment for any reason, the Employee will promptly deliver to the Company all documents, records, files, notebooks, manuals, letters, notes, reports, customer and supplier lists, cost and profit data, e-mail and any other material of the Company, including all materials pertaining to Confidential Information, developed by the Employee or others, and all copies of such materials, whether of a technical, business or fiscal nature, whether on the hard drive of a laptop or desktop computer, in hard copy, disk or any other format, which are in the Employee's possession, custody or control. If the Employee personally owns the laptop or desktop computer on which the Confidential Information is stored, the company will erase the Confidential Information and will return the equipment to the Employee. The Employee agrees to cooperate and assist in such effort. The Employee further agrees that (s)he will not keep any such documents, materials or information in his or her possession, recreate them or deliver them to anyone else. The Employee further agrees that all Company owned property, whether situated on the premises or outside of its premises, including smartphones, PDA's, thumb drives, laptop computers, printers, disks and other storage media, filing cabinets or other work areas and including any email transmitted from any Company or other system relating to the Company is subject to inspection by Company personnel at any time with or without notice.

        4.    <u>Work for Hire, Assignment of Intellectual Property.</u>

        (a)    Employee agrees that all materials created by Employee under this Agreement, including but not limited to programming design, specifications and code, drawings, ideas, inventions, discoveries, improvements, plans, models, sketches, and all results and proceeds created, conceived, or made by Employee alone or with others at any time during his or her employment, and all of my work product in connection therewith, whether patentable or not, (collectively, "Materials"), shall be deemed to be "work[s] made for hire" as defined in the United States Copyright Act. The Company shall own the Materials, including the work, and all proprietary and intellectual property rights therein and thereto, including but not limited to, all copyrights and trademarks, and all of the results and proceeds of Employee's employment hereunder throughout the universe in perpetuity, free of any and all claims by Employee or any person, corporation or other entity performing services for or deriving any rights from Employee. Employee hereby waives all moral rights in and to the Materials. Employee shall promptly disclose to Company any and all Materials. Additionally, or alternatively, as the case may be and notwithstanding any other provision in this Agreement, Employee hereby agrees to assign and assigns to the Company all rights, including but not limited to, all copyrights, patents, and other proprietary and intellectual property rights, as well as all moral rights that Employee has or may acquire in and/or to the Materials, or any of them, and agrees to execute and deliver to Company any and all applications, assignments and other instruments relating thereto which the Company deems necessary or desirable in its discretion. These obligations shall continue beyond the termination of Employee's employment with respect to Materials and derivatives of such Materials conceived or made during Employee's employment with the Company. Employee understands that the obligation to assign Materials to the Company shall not apply to any

3

materials developed entirely on Employee's own time without using any of the Company's equipment, supplies, facilities, and/or Confidential Information unless such Materials (i) relate in any way to the business or to the current or anticipated research or development of the Company; or (ii) results in any way from the work Employee provided to the Company.

(b)     In any jurisdiction in which moral rights cannot be assigned, Employee hereby waives any such moral rights and any similar or analogous rights under the applicable laws of any country of the world that Employee may have in connection with the Materials for all uses of the Materials, and to the extent such waiver is unenforceable, hereby covenants and agrees not to bring any claim, suit or other legal proceeding against the Company claiming that Employee's moral rights have been violated.

(c)     Employee agrees to cooperate fully with the Company, both during and after Employee's employment with the Company, with respect to the procurement, maintenance and enforcement of copyrights, patents, trademarks, trade secrets and/or other intellectual property or proprietary rights (both in the United States and foreign countries) relating to such Materials. Employee shall execute and deliver to Company all papers, including, without limitation, copyright applications, patent applications, declarations, oaths, formal assignments, assignments of priority rights and powers of attorney, which the Company may deem necessary or desirable in order to protect its rights and interests in any Materials. Employee further agrees that if the Company is unable, after reasonable effort, to secure Employee's signature on or delivery to Company of any such papers, any officer of the Company shall be entitled to execute such papers as Employee's agent and attorney-in-fact and Employee hereby irrevocably designates and appoints each officer of the Company as Employee's agent and attorney-in-fact to execute any such papers on Employee's behalf and to take any and all actions as the Company may deem necessary or desirable in order to protect its rights and interests in any Materials, under the conditions described in this paragraph.

5.     Non-Solicitation. (a) During the Employee's employment with the Company and for a period of twenty-four (24) months following the termination thereof, the Employee shall not, directly or indirectly, on his or her own behalf or on behalf of any person, firm or corporation, or in any capacity whatsoever, solicit or accept business from any Customers or prospective Customers of the Company or encourage any Customer or prospective Customer not to do business with the Company.

(b)     The Employee further agrees, for a period of twenty-four (24) months after termination of his or her employment with the Company, that (s)he will not directly or indirectly hire, solicit or attempt to hire or solicit any employee of, or consultant to the Company, which employee or consultant had been rendering services to the Company at anytime within the twelve (12) month period immediately preceding the termination of employment.

(c)     For purposes of this Agreement, the term "Customer(s)" shall mean any individual, corporation, partnership, business, municipality, governmental authority or other entity, whether for-profit or not-for-profit public, privately held, or owned by a government that is a business entity or individual with whom the Company has done business or with whom the Employee has actively communicated with during the twelve (12) month period preceding the termination of his or her employment.

4

11.    Severability.    If any provision of this Agreement is declared void or unenforceable by a court of competent jurisdiction, all other provisions shall nonetheless remain in full force and effect.

12.    Governing Law.    This Agreement shall be governed by and interpreted exclusively in accordance with the laws of New York State, without regard to conflict of laws provisions thereof to the extent that the general application of the laws of another jurisdiction would be required thereby. All disputes arising from or relating to this Agreement shall be heard exclusively in a court of competent jurisdiction within the State of New York, County of New York and the parties hereto consent to personal jurisdiction in such courts for such purposes, and further waive all objections on grounds of improper venue or inconvenient forum.

13.    Waiver.    The waiver by either party of a breach of any provision of this Agreement shall not constitute or be construed as a waiver of any subsequent breach. The failure of a party to insist upon strict adherence to any provision of this Agreement on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that provision or any other provision of this Agreement.

14.    Assignment.    This Agreement is a personal contract and Employee may not sell, transfer, assign, pledge or hypothecate his or her rights, interests and obligations hereunder. Except as otherwise herein expressly provided, this Agreement shall be binding upon and shall inure to the benefit of Employee and his or her personal representatives and shall inure to the benefit of and be binding upon the Company and its successors and assigns, including without limitation, any corporation or other entity into which the Company is merged or which acquires all or substantially all of the assets of the Company.

15.    Entire Agreement.    This Agreement embodies all of the representations, warranties, and agreements between the parties relating to the Employee's employment. No other representations, warranties, covenants, understandings, or agreements exist between the parties.   This Agreement shall supersede all agreements, written or oral, relating to the Employee's employment. This Agreement may not be amended, modified or terminated except by a writing signed by the parties.

[*Signature page follows*]

6



IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered on the date below.

_____          $7-9-19$
**Rob Loeb**                              Date

**COURTALERT**

By: _____       $7/15/2019$
       Yaniv Schiller                     Date
       Chief Operating Officer

**7**

Dear Yaniv.

I hereby tender my resignation from my employment with Court Alert.   My intention is to end my employment effective May 15, 2020 but I am willing to serve the standard notice period which can be waived at a Court Alert discretion as mentioned paragraph 9 of my employment agreement. During that period, CourtAlert will continue to pay me my salary and any commissions earned.
Please note that I went to the office this morning and drop off the company equipment and materials issued to me.
I sincerely appreciate the opportunity that you have given me and wish you the best of luck.

In addition to my regular pay, unused earned vacation, and any unpaid expense reimbursements, I am also owed the commissions on the following accounts:

REDACTED

Thank you.
Rob Loeb

**Erez Bustan  | President and CEO | American LegalNet, Inc. |** Office: 818-817-9225 ext 210| Fax: 818-817-9238
**American LegalNet, Inc.** | (818) 817-9225 ext.1039 | ALNCorp.com



 Please consider the environment before printing this e-mail.

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, forwarding, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by e-mail or telephone, and delete the original message immediately. For more information, please visit ALNCorp.com.  Thank you.